U.S. COURTS

SEP 22 2023

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

David A. Crossett
dcrossett060523@outlook.com
784 S. Clearwater Loop
Suite R
Post Falls, ID 83854

*pro se*

## UNITED STATES DISTRICT COURT

## DISTRICT COURT OF IDAHO

David A. Crossett

                Plaintiff,

v.

Cox Law,
Jon Cox,
Elcox Ventures,
Edwina Elcox

                Defendants

Case No. 1:23-CV-00419 AKB

**COMPLAINT FOR MALPRACTICE**

**DEMAND FOR JURY TRIAL**

## <u>PLAINTIFF'S COMPLAINT</u>

For its complaint, Plaintiff David A. Crossett alleges the following:

### I.    <u>THE PARTIES</u>

1.    Plaintiff David Crossett is an individual and a resident of Washington State, living in

Camas, Washington.

2.    Upon information and belief, Cox Law is a Professional Limited Liability Company that

does business within this judicial district by and through its employee Jon Cox, who lives and



works in Boise, Idaho. The address of Cox Law is 199 N. Capitol Blvd, Ste. 601, Boise, Idaho 83702.

3.      Upon information and belief, Jon Cox is the owner or managing partner of Cox Law.

4.      Upon information and belief, Jon Cox is an individual that resides in Idaho, and is a practicing criminal attorney.

5.      Upon information and belief, Elcox Ventures, DBA Elcox Law, is a General Professional Partnership that does business within this judicial district by and through its employee or partner or owner Edwina Elcox, who upon information and belief lives and works in Boise, Idaho. The address of Elcox Ventures is 8777 W Holbrook Ave., Boise, ID 83704.

6.      Upon information and belief, Edwina Elcox is the owner of Elcox Ventures and resides in Idaho and is a practicing criminal attorney.

## II.    JURISDICTION AND VENUE

7.      Based upon Erie doctrine, this is an action for malpractice pursuant to Idaho Code 5-219. Jurisdiction of these claims is conferred on this Court by 28 U.S.C. 1332.

8.      This Court has jurisdiction over Plaintiff David Crossett, an individual, pursuant 28 U.S.C. 1332 as he is a citizen of a State other than Idaho and the matter in controversy exceeds $75,000.

9.      This Court has jurisdiction over Defendant Jon Cox and Defendant Edwina Elcox because upon information and belief they live within and regularly do business within the State of Idaho and within this judicial district.

10.     This Court has jurisdiction over Defendants Cox Law and Elcox Ventures because they

**COMPLAINT FOR MALPRACTICE**

pg. 1

are formed in Idaho, regularly do business within the judicial district of Idaho, from which this action was caused.

11.    Jurisdiction is proper in the Idaho District Court of Idaho pursuant to 28 U.S.C. 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000.

12.    Venue is proper in Ada County pursuant to 28 U.S.C. 1391 as all Defendants work and reside in this Court's jurisdiction.

### III.    SUMMARY OF FACTS

13.    Plaintiff incorporates the preceding paragraph by reference as if each were fully set forth herein.

14.    R.C., Plaintiff's daughter, alleged sex abuse by the Plaintiff to police on July 29, 2020 when she was 19 years old. Detective Daniel Wilkins and Detective Ashley Hageman-Turner conducted the first interview. Two interviews took place over two days with Detective Hageman-Turner performing the second interview (July 29 and 30). Both are recorded. R.C.'s new boyfriend of a month – Kelon Waters, 27 years old at the time – was in attendance and actively participated. Her statements were generalized in nature, contradictory, and lacking detail.

15.    During their investigations into alleged instances of sexual abuse, Detective Ashley Hageman-Turner and Detective Daniel Wilkins were made aware multiple times by R.C. that the Plaintiff had been diagnosed with bipolar disorder and Asperger's syndrome (autism spectrum disorder), and she also mentioned Plaintiff may have paranoid schizophrenia, a very serious mental condition. As per available information, the detectives appeared to take no substantive action upon receiving this information. They neither conducted any significant investigation into

COMPLAINT FOR MALPRACTICE

the Plaintiff's condition, nor did they reach out to the Plaintiff, his ex-wife (who is the mother of the alleged victims), or the Plaintiff's siblings to gather additional information. When they later interviewed the second accuser, who is the Plaintiff's step-daughter, they neglected to inquire about any potential mental health or disability aspects. Neither detective reported a mental health or disability concern in either of their narrative reports, nor did they report that R.C. had disclosed this information. Their investigation violated many accepted norms, best practices, and laws. Both detectives and the Sheriff's Office are concurrently being litigated against for various civil rights and ADA violations.

16.    The case was referred to the Ada County Prosecutor's Office for prosecution. A warrant for Plaintiff's arrest for 3 charges related to R.C. was issued in October, 2020, upon which he turned himself in. He was released the next day on his own recognizance, originally set for a $500,000 bond. Katelyn Farley, the Prosecutor for Idaho, sent the Plaintiff a settlement agreement, stating that she would add 3 more charges related to M.W. if he refused it, which he did. Ms. Farley then assembled a Grand Jury and received indictments for 6 charges against Plaintiff with a $1,000,000 bond.

17.    Plaintiff was indicted on December 22, 2020 for six (6) counts of sexual misconduct with a minor. The alleged victims in the case are Plaintiff's daughter and step-daughter, whom he considers a daughter and the family doesn't make distinctions. He was arrested a second time and pled not guilty. He was released on a reduced $75,000 bond.

18.    Plaintiff engaged Jon Cox of Cox Law, Boise, Idaho, in October 2020 in anticipation of legal action upon hearing an active investigation was taking place. He remained Plaintiff's

**COMPLAINT FOR MALPRACTICE**

counsel after his second arrest in December 2020 and throughout the trial. Plaintiff terminated his services in July, 2023.

19.     Mr. Cox persistently questioned him about his defense, telling him it was his responsibility to find a way to help jurors understand the calls between him and his daughter (there were 6 recorded confrontation calls made). His overall attitude conveyed a sense that the calls were insurmountable, leaving the Plaintiff with the impression that Mr. Cox lacked belief in his innocence or his potential for success. The Plaintiff has no training in the law so was unaware of his options for explanation, what defenses might be available, or the thresholds of evidence required to be successful.

20.     Plaintiff tried to get his disability into discovery. He obtained an updated diagnosis at his own expense around November, 2020 to prove his diagnosis to Mr. Cox and use in discovery. Mr. Cox refused to put forward into discovery any information about Plaintiff's disability, for any purpose.

21.     In frustration and lack of faith of his defense, Plaintiff then hired a second attorney, Edwina Elcox, and immediately informed her of his disability. She was equally unfamiliar with the disability or laws pertaining to it, and likewise expressed thoughts about the calls being too difficult to overcome and that the Plaintiff needed to be able to defend or explain them. She too didn't understand the magnitude of Plaintiff's A.D.A. disability as it pertained to his defense. She was a former colleague of Mr. Cox's and he recommended her.

22.     Trial was moved multiple times since the arrests in late 2020. This represents around two and a half years for trial preparation.

**COMPLAINT FOR MALPRACTICE**

23.    The jury trial began on June 5th, 2023, and concluded on June 14th, 2023. Guilty verdicts were reached on Counts I - V, while Count VI resulted in a not guilty verdict. The initial jury pool was wholly dismissed due to significant bias against the Plaintiff based largely on visual observation, leading to an insufficient number of jurors remaining after many dismissals for bias. This extraordinary event, referred to as the jury "self destructed" by the Judge, prompted the seating of a new, larger jury pool the next day.

24.    Mr. Cox attempted to address the disability at trial in opening statements informing the jury they would hear about the Plaintiff's Asperger's (also known as autism). It was important for the jury to know this, as the Plaintiff has visible mannerisms that seem odd to the casual observer, such as his struggles to make appropriate eye contact, physical ticks, and his facial expressions and emotions often don't match the moment, which confuses observers as to what he's thinking or how he feels. His family and friends are well aware of these facts. Mr. Cox was immediately objected to and after a sidebar the Judge sustained the objection. For the duration of the trial, Asperger's was not allowed to be brought up at all by anyone. Mr. Cox privately instructed witnesses that they were not to mention it or bring it up in testimony under any circumstances.

25.    After a 5 day trial (once a jury was seated), Plaintiff was convicted on five counts: 2 were alleged instances of vaginal touching, while the other 3 were alleged generalized touching of "hips, buttocks, thighs, breasts" for sexual gratification. Plaintiff admitted over 6 recorded calls with R.C. his generalized physical contact (given the family culture of hugging and playing) but denied any sexual intent, vaginal touching, or gratification. He consistently denied vaginal

touching, other than possible incidental contact (given the family's physical horseplay and laying around together). Phone calls were edited by Prosecutors in such a way as to misrepresent the communication, casting the Plaintiff in a suspicious light, and due to counsels' neglect redactions were still being managed literally the night before trial so it was unknown to the defense what exactly was going to be played.

26.     After the trial, Defendants showed no interest in further representing the Plaintiff and essentially abandoned him. They did not file notice of appeal, in spite of knowing Plaintiff wanted to appeal (having, in fact, asked them both for a referral to an appeal attorney as he had been told they don't do the appeal, but not knowing they should have filed the notice). He was told to take a few weeks off and just prepare for sentencing. He asked for a 1 hour meeting from them to which Mr. Cox never replied and Ms. Elcox was either unavailable or stated she was ill. He was not informed of his right to remain silent during the psychosexual evaluation or the pre-sentencing investigation. He was not instructed as to what to do about his pre-sentencing requirements, leading Plaintiff to have to ask whether he should be scheduling appointments, etc. He was not instructed about the sentencing procedure or what to expect or what to prepare for. Plaintiff kept trying to get information about next steps but was met with silence.

27.     They also misinformed him of his post-trial options, namely Ms. Elcox. He was only informed he could file for a new trial based on new evidence – he was never instructed there were other grounds for a new trial. As the two-week post-conviction window closed per Idaho Rul 34(b)(2), Ms. Elcox asked Plaintiff if he'd like a new trial and that he had to decide before that window closed. He declined believing he had no new evidence. Based on emails between

**COMPLAINT FOR MALPRACTICE**

the two, Ms. Elcox clearly knew he was only educated about and speaking on the topic of not having new evidence. However, in her email asking for an ultimate decision before the filing window closed, she cleverly pasted a portion of Rule 34 alluding to filing on "other grounds", but with no legal experience nor understanding of the rules, this detail wasn't noticed and the Plaintiff declined further filings believing that new evidence was the only grounds for a new trial.

28.    Plaintiff fired his attorney for malpractice and attempted to proceed *pro se* and made a few filings to be heard by the judge, including a motion to stay sentencing until he could obtain a transcript and review the case for error, as his counsel had no interest in pursuing any post-trial review or actions, instructing the Plaintiff to take a few weeks off. At the hearing to proceed *pro se*, the judge made comments to the Plaintiff which he perceived as threats and causing him great distress. He made the comment – to the best of Plaintiff's memory – "If you go *pro se* I will hold you to the same standards as any attorney, I'm not going easy on you" and "Are you sure you want to do that? I just sentenced a person that did that." This scared the Plaintiff upon which he asked to be dismissed for a period of time to seek counsel and make his phone calls of support for guidance. In fear and under pressure, he accepted a public defender believing he would be penalized if he proceeded on his own, despite his preparation and studying of his motion. The Judge was aware of the Plaintiff's disability as the Plaintiff had included it in his motions asking for a reasonable accommodation in his filing.

29.    Plaintiff now finds himself barred from making filings on his own in the criminal matter, his pre-sentencing appeal window has closed, and his window for new trial motions has closed.

**COMPLAINT FOR MALPRACTICE**

He is told he has no other pre-sentencing remedies but for the malpractice of his attorneys.

## IV.    COUNSELS' PERFORMANCE

### 1.    Counsel was aware of Defendant's protected ADA status

30.    Throughout the two and a half years leading up to the trial, the Defendant repeatedly informed both attorneys about his bipolar disorder and autism diagnosis. However, due to their lack of expertise in ADA law and mental health conditions, they failed to grasp the significance of this information and were dismissive of it as an issue. As a result, they did not properly analyze or investigate the potential impact of the Defendant's disability on his criminal defense. Despite the Defendant's consistent requests, his disability was not presented to the jury, and this crucial aspect of his case was disregarded.

### 2.    Refused to investigate

31.    Upon receiving the State's evidence, counsel failed to investigate their claims and evidence. Until trial, they were unfamiliar with what was said in the police interviews and what the documents were that R.C. had provided to police. Defendant was always being asked for information contained in the documents or where statements were made, or being reminded of evidence contained within them. Seeing this lack of engagement and familiarity with the evidence, Defendant took it upon himself to transcribe the interviews, parse the interviews for inconsistent statements, and encourage his counsel to get familiar with the facts of the case. In preparation for trial, and in an effort to ensure his counsel had sufficient information, the Defendant delivered an extensive amount of evidence and materials, including nearly 1,200 Bates-numbered documents, witness questions and cross exam, timelines, case strategies, and

COMPLAINT FOR MALPRACTICE

more. He even created and compiled his counsels' 305 page trial binders.

32.     Early in the course of their engagement, Defendant's counsel acknowledged the need for an explanation regarding the content of the phone calls and expressed willingness to consider the inclusion of an autism expert witnesses. However, thereafter Defendant struggled to convince counsel to use expert witnesses, especially around mental health. Counsel failed to research and understand how disability or mental health factored into the case. Defendant tried to educate his counsel, and to continually advocate for himself and his desired defense, yet his repeated requests for the presentation of his disability were not addressed.

33.     To demonstrate the reality of his mental conditions, disability, and prove his previous diagnosis of bi-polar and autism, Defendant pursued a new self-funded diagnosis on November 17, 2020. Despite sharing this diagnosis report with counsel, his attorney declined submitting this report for production. The lack of production, which will be argued herein as a case of malpractice and a civil rights violation, was a devastating error in this case and unfairly prejudiced the jury resulting in an improper conviction.

### 3.  Expert witnesses

34.     Due to counsel's failure to adequately investigate and familiarize themselves with the relevant facts of the case, and their disinterest in building a defense, the Defendant took it upon himself to independently research, interview, retain, and manage potential expert witnesses. The Defendant identified up to five expert witnesses with expertise in various areas related to the case, as well as an expert consultant on false charges of sexual assault, Dean Tong, from Florida. The Defendant's proactive efforts in seeking out these experts and having to advocate for their

**COMPLAINT FOR MALPRACTICE**

usage highlights the deficiencies in counsel's approach and their failure to fulfill their responsibilities in building a robust defense.

35.     One of these expert witnesses specialized in false confessions.  Given that the State presented the phone calls as confessions, the Defendant wanted to educate the jury about the numerous factors and prevalence of false confessions, especially those with autism, as well as the key required elements for a "knowing, intelligent, and voluntary" confession. "When involuntary confessions have been introduced at trial, the Court has always reversed convictions regardless of other evidence of guilt. As we stated in *Lynumn v. Illinois, 372 U. S. 528, 537,* the argument that the error in admitting such a confession "was a harmless one . . . is an impermissible doctrine." That conclusion  has been accorded consistent recognition by this Court." *(Chapman v. California, 386 US 18 - Supreme Court 1967; citing Malinski v. New York, 324 U. S. 401, 404; Payne v. Arkansas, 356 U. S. 560, 568).* Defendant's counsel hadn't reviewed the evidence sufficiently to understand why this witness would be important.

36.     Another such expert was Carol Wienman, who specialized in autism and had legal expertise as a former prosecutor. Again the Defendant advocated for her use and again was unable to overcome counsel's lack of understanding of his conditions. This witness could have provided scientific data that people with autism behave in ways that look like grooming to most people, but factually they're just unaware of personal boundaries. This witness could also have provided a scientific foundation and evidence that there is a reasonable alternative for the content of the calls. This would have helped the jury to hear the calls in the same way the Defendant's many supporters and family heard them that continue to support him. Had they been given the

right evidence, they would have returned a different verdict.

37.     The Defendant obtained another expert witness specializing in false memories and forensic investigative techniques, Dr. Davidson. Once again, the Defendant had to persuade his counsel of the importance of this witness and organize meetings between them. Counsel met with Dr. Davidson and agreed to commission a report, but after that Defendant was left to manage Dr. Davidson on his own, up until the day of his testimony in trial. This included being the sole provider of the necessary information and materials to expertly evaluate the case.

38.     Due to counsel's lack of proper management and attention to detail, a crucial oversight occurred with Dr. Davidson's report. The report initially utilized materials and standards intended for children – whereas R.C. was an adult when she accused - which went unnoticed until the State motioned to exclude the evidence. Despite defense attempts to correct the error, the State successfully suppressed important portions of Dr. Davidson's conclusions and testimony. These conclusions were essential as they scientifically supported claims that R.C.'s memory was manipulated and that Mr. Waters interfered with the investigation. In spite of counsels' efforts to remedy the mistake, they were unable to and the exclusion of this evidence significantly hampered the Defendant's ability to present a proper defense.

### 4. ADA/Civil rights violations

39.     The Defendant requested of one of his counsel to investigate ADA accommodations for the trial due to concerns about how the jury would perceive his physical mannerisms or accommodations regarding taking the stand. Counsel failed to act on this request. The implosion of the first jury pool could be seen as evidence supporting the Defendant's concerns.

COMPLAINT FOR MALPRACTICE

40.     Defendant's counsel did not ensure Defendant had a jury of his peers. This does not require a panel of mental health experts, but counsel failed to address the issue in viore dire and ensure the issue of mental health or disability was brought up during the selection of the jury.

41.     Defendant's counsel also failed to investigate and present the fact that the phone calls made by R.C. to the Defendant were taken under duress. During the time of the calls, the Defendant was facing serious accusations of raping his daughter and causing vaginal scarring, which were later retracted. He was also dealing with a separation from his significant other and experiencing employment difficulties due to the allegations.

42.     This traumatized the Defendant and may have triggered his mental condition as he tried to cope with such an allegation. We know at this time that R.C.'s initial allegation is untrue, as she later retracted these accusations and two doctor's reported her anatomy was healthy with no trauma, and one reported her hymen intact. In these 6 confront calls, R.C. changed her allegations and instead insisted that the Defendant admit he touched her vagina, and he must do that if he wants a relationship with her, as well as for the "betterment of her health and relationship" with the family. Essentially he was told that if he just says what she wants him to, everything can go back to normal. In the course of the calls the Defendant seems to have admitted to possible incidental contact based on the family's physical closeness, but maintained it was never sexual.

43.     As shown, the Defendant is vulnerable due to his autism and bipolar. He presents as an intelligent and seemingly normal person, but has specific traits that are devastating to his life. These traits were on display in these phone calls as the Defendant tried to comply with his

COMPLAINT FOR MALPRACTICE

daughter's request of admittance yet maintain his denials of anything sexual in nature.

### 5. Refused to prepare

44.     Defendant's trial was prejudiced for counsel's lack of preparation. Despite the Defendant's insistence on prior preparation for years, it was not until after the State rested their case that counsel met with Defendant's witnesses Porter Crossett, Erica Garcia, and Rayce and Katie Peterson for the first time. These witnesses were critical to the testimony of Mr. Waters conspiracy and R.C.'s early claims of having no memory of any abuse. This fact also demonstrates the lack of strategy and preparation, as the cross examination of R.C. and M.W. was already complete by the time these witnesses were first interviewed by counsel. Additionally, Defendant's counsel had not met Ms. Crossett until she was in town for the trial. Counsel met with her for a short time but did not discuss much about her testimony or what she knew. Shortly before she took the stand, his attorney told her she can't discuss Asperger's. She took the stand before counsel expected her to (as the State rested their case sooner than expected). Taking the stand precluded counsel from being able to prep her over the long weekend and learn what she had to say, as she was then instructed by the Court not to discuss the case. This lack of preparation hindered the effectiveness of witness testimonies, including multiple impeachment opportunities, and weakened the Defendant's case.

45.     Defendant's counsel's lack of preparation was evident during the examination of the first witness, Charity Crossett. Counsel was caught off-guard when the State rested earlier than expected. Counsel didn't have questions prepared for her examination, leading to disorganized and ineffective testimony. Ms. Crossett, being the Defendant's ex-wife and mother of the alleged

victims, held crucial information that went unsolicited due to lack of preparation.

46.    Counsel failed significantly for lack of preparation on the phone calls. Counsel was still managing redactions with the State as late as June 4, 2023 – the day before trial. Defendant had been consistently asking for years for call redactions as early as possible. Defendant was prejudiced for his counsel's lack of preparation, as a proper defense couldn't be built without knowing what evidence was to be played in court. It was particularly damaging to neglect this aspect of trial. Although counsel made 403b arguments just before the case went to deliberations (and denied), the damage was done and the calls had been been played in court. In addition, counsel was unable to effectively argue the facts surrounding the 403b evidence for lack of knowledge of the facts of the case.

47.    A most obvious lack of preparation is demonstrated by the fact that the Defendant was drafting and submitting trial and witness materials to counsel *after* trial commenced. This also demonstrates a lack of strategy and preparation from the counsel prior to the trial, as there was little to no preparation of materials, audio/video clips, or demonstrables.

### 6.  Grave procedural mistake

48.    Defendant's counsel also mistakenly and prematurely released Rayce and Katie Peterson instructing them that they could attend trial.  It was unclear whether Mr. Waters would appear for testimony, but when he did appear for testimony, counsel realized their mistake and requested the Judge allow these Katie Peterson, who was in attendance, to leave the room during his testimony for rebuttal recall.  However, this request was objected to, leading to the inability to recall a critical key witness for rebuttal.  This crucial error prevented Defendant's counsel from

COMPLAINT FOR MALPRACTICE

demonstrating the extent of Mr. Waters' involvement, the developed conspiracy, and his negative influence on R.C.. Additionally, substantial impeachment and motive evidence could not be presented.

### 7. Defendant denied the right of his opportunity to be heard

49.     The Defendant had initially planned to testify in his own defense.  However, he decided against it due to a legal error made by his counsel and/or the judge which would prevent him from discussing his autism diagnosis, a crucial aspect of his life. This error would prevent him from explaining his motive and comments in the calls, absence of sexual intent in his behaviors, and why his closeness was not grooming.  He was also concerned that had he testified without the jury being informed of his condition, they would judge him negatively for his autistic mannerisms such as stuttering, lack of eye contact, or general posture.

### 8. Refusal and failure to put forth evidence

50.     While there may be no specific duty to present evidence, failure to present potential mitigating evidence can contribute to a finding that counsel professionally failed their client. *(Williams v. Taylor, 529 US 362 - Supreme Court 2000 at 396)*. In *Williams,* council failed to introduce available mitigating evidence of an abusive childhood and mental health issues *(borderline retardation in Williams' case, not the defense in this instant case)*, commenting that this failure of putting forth the evidence was "unprofessional service [that] prejudiced Williams within the meaning of *Strickland*" *(Id. at 397)*.

1.

51.     Defense counsel's failure to investigate and prepare led to prejudicial call redactions that otherwise could and should have been mitigated, and possibly removed as IRE 403 and 404b. This grave error in evidence is later detailed in the "Judicial Error" section.

52.     Idaho Rules of Evidence 106 states that "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time." Defendant was directly misinformed of the latitude this rule allowed when he tried to assist in the call redaction process. It certainly would have been "fair" for counsel to have demanded the section of call to be played where Defendant clearly denied in no uncertain terms the claims of Count IV. It likewise would have been helpful for the jury to hear statements such as "I don't see you as a sexual object", "no, no, I don't remember it. I don't know how many ways to say that, I don't remember… doing that.", "You are not an object for me to get off on, you are not somebody I'm trying to satisfy myself sexually with" (all *contained in phone calls*). These statements go directly to intent. There were many statements made out of context that couldn't be corrected without the Defendant's testimony (which was blocked due to error).In another instance, a last minute redaction was requested by Defendant's counsel that even the State was surprised they asked for. It was so damaging to the Defendant that the Prosecutor specifically put on the record that Defendant's counsel asked for this redaction, thus preventing future objections. This redacted portion of the call was a break in a train of thought being articulated by the Defendant. A casual hearing of the redaction would lead a listener to believe the Defendant is saying that R.C. is a sexual object to him. However, in full context, he is

specifically and clearly telling his daughter she is not a sexual object to him (a comment he said multiple times in multiple calls). This redaction – absent the sexual intent statements referenced above – again misrepresents the Defendant due to insufficient preparation by his counsel.

53.     In spite of R.C. being impeached, counsel refused to put the critical evidence before the jury. R.C. initially had no memory of anything sexual with Defendant.  She then confronted the Defendant but didn't accuse anything, but instead just had questions.  She then reported to the family no memory of any abuse – she was only questioning if something happened. She alleged a vaginal scar. She then said "something happened.. if not dad, who?" She then around July 14, 2020 reported to Central Health doctor that she was raped. She then told police July 29, 2020 that she was penetrated but was unsure "vaginally or anally". The following day she told police that the Defendant only "got close" to touching her vagina, but that his hand was just resting "above where she pees". *(State Evidence 5540_0005_07-30-20_1020_AHAGEMAN_-_Ryann_state at 15:11: Detective: "When he had his hand sitting there, was it on the pubis bone or was it all the ender to where it was touching labia... Vagina area.": R.C.: I only remember it getting close to, um, the vagina.... Detective: Okay, so close to where maybe you urinate...: R.C: Yeah...").*

54.     R.C. claimed vague and fuzzy memories, requiring Mr. Waters to finish parts of her narrative to police. R.C. and Mr. Waters were then informed by the investigator that only touching is required for a sex crime. *(State Evidence 5540_0005_07-30-20_1020_AHAGEMAN_-_Ryann_state at 20:38.)* After this conversation, accusations of rape and vaginal scarring were no longer brought up, but now R.C. approached her dad with

suspicious new memory that he touched her vagina. She retracted any allegations of penetration or scarring. She then testified at the Grand Jury that the Defendant had "fingered her", but tried to backtrack saying "but mostly staying on the outside". Then in trial she worked hard to redefine penetration and fingering yet again to fix her inconsistencies *R.C. trial testimony*. But due to lack of preparation of trial materials and witnesses, this evidence was either not presented or at a minimum so chaotic as to be impotent.

## II.

55.    The defense had available strong evidence suggesting a conspiracy orchestrated by Kelon Waters, the boyfriend of R.C., which involved manipulating R.C. to make false allegations. Most of this evidence was not presented to the jury due to the witness mistake regarding rebuttal witnesses against Mr. Waters. Defendant's counsel were not prepared sufficiently to present a case around the conspiracy. The facts supporting this conspiracy included:

- Kelon (27 years old) isolated R.C. (19 years old) from her family and friends, exhibiting controlling behavior. They knew each other barely a month when this began.

- He planted the idea of sexual molestation after a failed sexual experience with R.C..

- Kelon used YouTube videos and a psychology textbook to convince R.C. she was a victim. His YouTube playlist included videos on the Art of War and how to catch sexual predators.

- He performed a vaginal exam on R.C. and claimed to find a vaginal scar.

- Kelon took R.C. to a rape clinic to collect evidence against the Defendant.

**COMPLAINT FOR MALPRACTICE**

- He worked with R.C. to secure her finances before revealing the allegations.

- He was upset that R.C. was talking to people about her upcoming allegations against Defendant.

- Kelon took R.C. to the police, heavily interfered with the investigation, answering questions on R.C.'s behalf and redirecting the detective's line of questioning 54 times.

- He made statements about when they do "our [confrontation] calls" to the Defendant.

- Kelon revealed a motive to harm the Defendant and expressed disgust about R.C.'s constant positive views of her father.

- Kelon revealed his motive when asking the Prosecution "if we have something that disproves he did anything, can the *defense* use it?"

- Kelon provided affirmative statements of observations about the Defendant to the police regarding his interactions with R.C., including claims of sexual actions, intent, and motive. However, it is important to note that Mr. Waters had never met the Defendant or witnessed his interactions with R.C.. Furthermore, R.C. herself did not make similar statements regarding the Defendant's intent, and when once asked about it, she described his behavior as simply being immature.

- Kelon had discussions with the detective regarding the legal definition of a crime in Idaho and the language required for an admission. As a result of these discussions, specific accusations of rape, penetration, and scarring were omitted in subsequent retellings of the allegations, even by the Prosecutors — this was not brought up in Grand Jury testimony nor in trial. Instead, R.C.'s allegation was reduced to "you touched my

vagina," as she was informed by the detective that this was the minimum act to constitute a crime.

- He engaged M.W., the second alleged victim, in discussing molestation allegations, at times without R.C.'s presence or knowledge (police interview).

- M.W. eventually blocked Kelon from contacting her, calling him a "psycho" and R.C.'s "puppet-master".

- Kelon assisted in the recording process, a known MO based on statements from his ex-wife about his practice of recording people and blackmailing them.

- He engaged the help of a local attorney for unknown reasons and R.C. communicated with the attorney directly.

- Kelon is conspiratorial and believes the U.S. military was trying to kill him, stating that he had to hide from people in the walls while in service, and that he'd get himself arrested on purpose to be in a safe place overnight. He claimed sexual assault in the military. He had prepared a case to bring to a U.S. Senator. He had many other such fantastical stories.

- Expert reports by Dr. Davidson pointed to Kelon's role as a hyper-vigilant caretaker affecting R.C.'s memory and allegations.

56.    This was not the 'concerned bystander boyfriend', but rather the motivated orchestrator of a conspiracy. Establishing these facts was crucial to the defense's case as they would have addressed the jury's question of motive and highlighted Mr. Waters' extensive influence over R.C.. However, due to witness mismanagement, legal errors, and lack of preparation, the defense

**COMPLAINT FOR MALPRACTICE**

was unable to effectively challenge Mr. Waters' testimony and he appeared a choir boy instead of the malicious instigator he is.

## III.

57.    Defendant's counsel refused to present evidence of inconsistencies in the alleged victims' behaviors before and during the trial. The alleged victims posted on social media about their alleged victimization and made sexual jokes, showing a lack of seriousness and out of character for sex abuse victims. They manipulated and shared with family and friends edited recordings of the "confront" phone calls to influence others.  R.C. told her mother Charity Crossett that she needed to "be on the right side of history".  Additionally, they did not seek counseling or utilize the support available to them as alleged victims. In addition, it was R.C. that alienated her friends and family; not that she was ostracized from the family.  These facts were important for credibility as it relates to their allegations.

58.    In summary, the jury was only presented with an extremely limited and sanitized version of events, since Defendant's counsel refused to present the extensive evidence regarding conspiracy, inconsistent statements, unusual behaviors, interference in the investigation, and the alleged victims' memory issues and motivations.

### 9.  Mistake in subpoena rules

59.    The defense had intended to recall M.W. for impeachment purposes and potential clarification of her testimony. M.W. was listed as a witness for both the Defendant and the State, but she resides out of state in Wyoming. The defense counsel served her with a subpoena after

COMPLAINT FOR MALPRACTICE

her direct examination, but they were unaware that a witness cannot be compelled by a subpoena if they are already present in town under the State's subpoena. As a result, the defense was unable to recall M.W. due to this oversight, and the process of obtaining an out-of-state subpoena was not feasible within the given time frame.

### 10. Failure in jury instructions

60.    Despite an early Court decision allowing the inclusion of a special jury instruction to mitigate prejudice from the prejudicial joinder of the cases, Defendant's counsel failed to include these instructions despite repeated reminders by Defendant. The prejudice resulting from the combined cases and charges was evident in the comments made and tears shed by potential jurors in voire dire and their reaction to the extensive list of charges during the reading of the charges in court. The jury's perception of the volume of charges may have influenced their mindset, highlighting the need for the special instructions that were not provided. Other failures in jury instructions will be argued herein.

### 11. Refused to rigorously represent Defendant

61.    Defendant wishes to retain his rights of appeal, but he includes the following facts as context for the assertion that he wasn't represented properly.

62.    In early pre-trial motions, Defendant's counsel chose not to include a "statement of facts" section in their memorandums or answers. The Defendant, concerned about his counsel's unfamiliarity with the case, drafted some of the initial memorandums himself, including a "statement of facts" from the defense perspective. However, his counsel omitted this narration in the final versions of the motions. In contrast, the State always provided a narrative – often up to

**COMPLAINT FOR MALPRACTICE**

3 pages - that depicted the defendant as a perverse individual responsible for a series of horrible crimes. Without a counter-narrative or context presented by the defense, the judge reviewing the motions only had the information provided by the State's narrative.

63.      Due to the absence of a counter-narrative from counsel, the Defendant was concerned that the judge would accept the State's narration as factual, despite being told by his counsel that the judge can't consider attorney narration as fact. This concern materialized when the first judge, who was not presiding over the trial, refused to separate the cases, citing the State's portrayal of a "common scheme or plan" as sufficient based on "grooming" allegations. (The Court should note the impact of the accusation of "grooming" without the balancing mitigating factor of Defendant's autism – thus alleged grooming stood unchallenged.) Without any opposing information or even a denial from the Defendant, the judge was left with the impression that the Defendant accepted the facts as outlined and made confessions that confirmed intent, as presented by the State's version. However, when a motion to reconsider separating the cases was filed, the presiding judge seemed equally persuaded of the State's narrative and refused to overturn the previous judge. However, there was new evidence which did not show that M.W. alleged grooming behaviors – she only testified to two distinct allegations of abuse. It is reasonable to consider that the outcome of Defendant's pre-trial motions may have been different if his counsel had asserted any defense.

64.      A further discriminatory act in this trial was the moving of the Plaintiff's table. The jury wished to see the Plaintiff better, a curious request, and the judge illegally allowed discrimination and had the Plaintiff's table moved closer to the court into the open space before

the judge, and turned at an angle. This put the Plaintiff's autistic mannerisms on full display, in the center of the room, causing him great distress and anxiety, further exacerbating his physical mannerisms that are likely misinterpreted by the jury such as lack of eye contact, nervousness, sweating, awkward smiles or grimaces, etc. Plaintiff is unaware if this is a normal occurrence, but upon information and belief has been informed that it was unprecedented for that to be allowed.

### 12. Failures to inform

65.     At the close of trial, Defendant was not properly counseled of his options before sentencing. He requested a meeting with his attorneys but one didn't respond and the other claimed unavailability. The Defendant didn't know about any post-trial options, other than petitioning for a new trial based on new evidence. He declined filing for a new trial believing at the time he had no new evidence and his counsel agreed with him. Though he was technically notified of a deadline for ICR 34, he didn't research the law and thus wasn't aware there were "other" reasons for a new trial, and thus again declined any filings based on not having new evidence. He wasn't informed there were 6 other reasons he could move for a new trial per IC 19-2406. Instead he was told only new evidence could justify a motion, therefore counsel didn't file timely to extend the time to review the case and order transcripts, which Defendant attempted to do *pro se* after terminated their engagement. This lack of information and "cold shoulder" post-conviction limited the Defendant's post-trial options and remedies.

### 13. Kelon Waters – Fraud, Threat, and Perjury

66.     Kelon Waters committed conspiracy, fraud, and perjury against the Plaintiff and the State

of Idaho in violation of 18 U.S.C. 1621(1), 18 U.S.C. 1001(a)(1) and (2), and 18 U.S.C. 371. He

also made threats to kill the Plaintiff in violation of 18 U.S.C. 111 and Idaho Code 18-901. He

made false statements under oath, interfered with a State investigation with misrepresentations

and redirections, and conspired to trap and convict the handicapped Plaintiff. He did this with

malice and intent. He isolated R.C. from family and friends and lied to R.C. and held himself out

as an expert in female anatomy and told her he felt an internal vaginal scar with his fingers,

(which was the beginning of this ordeal and not true). He guided R.C. to ensure her finances

from her father were in hand and ensure her surgery was paid for by the Plaintiff and could not

be refunded before they dropped the false accusations of sexual misconduct against the father.

He then guided her to confront the family and secretly record the interaction. He worked to

protect the conspiracy by forcefully telling family members they should not be questioning R.C.

about her inconsistent details. He architected the confront calls including providing the recording

device and upon information and belief attended the confront calls to coach R.C. to elicit

incriminating statements from the Plaintiff. He participated in the investigation and directed or

otherwise interfered 54 times. His YouTube channel during the time of the investigation against

Plaintiff was full of videos of the TV series "To Catch a Predator" (a series dedicated to hunting

sexual predators) and other videos regarding how memories are formed and manipulated. He

engaged and managed M.W. allegations, ensuring they also aligned with the allegations of R.C.

He arranged and scheduled her testimony with Detectives, in spite of knowing M.W. for only a

few days. He has made statements to Plaintiff's family including statements that he wishes to

shoot the Plaintiff, that he wants to hurt the Plaintiff, and Court Guards were overhead saying

they need to be more attentive based on statements made by Kelon Waters that he was "coming for" Plaintiff and his attorneys, necessitating their special placement in the courtroom when he entered for testimony.

67.    Upon information and belief, he is psychiatrically unstable, conspiratorial claiming he was sexually assaulted by a gay KKK in the military with leadership approval (and was going to whistle blow by preparing a case to give to a state senator), and had to hide in the walls to avoid rape. He claims to have been a Ranger in the military (an elite force, which upon information and belief is a perjurious statement and not true, a violation of the Idaho Stolen Valor Act of 2013 for which Mr. Waters may be pursued), has made statements that he was discharged from the military on disability for breaking his back on an airborne jump in spite of currently riding a motorcycle, but upon information and belief he was released on disability for psychiatric issues. He attempted to dodge service for the trial, circling the female process server on his bicycle with his gun clearly visible on his waist. Based on background checks he's had over 20 addresses in the last 11 years and his ex-wife Hailey states she's in fear for her life from Kelon and wouldn't provide further information. He blamed R.C. for his trouble in performing sexually or sexually assaulted her in a way she resisted and caused trauma (as R.C. told the police she was resisting and saying "no no no, stop stop stop"). Upon information and belief the Plaintiff was warned by a person with knowledge - that wishes to remain anonymous for their safety - that even if Plaintiff won the court case, he still would not be safe and would be in constant grave danger from retaliation by Mr. Waters up to and including death. These allegations will be proven in trial.

**COMPLAINT FOR MALPRACTICE**

pg. 26

68.    Most of this incredible information about Mr. Waters was not put before the jury, due to Mr. Cox's complete failure to understand the issues and facts and prepare for trial.

## V.   CAUSES OF ACTION

69.    Idaho Code 5-219 defines professional malpractice as "wrongful acts or omissions in the performance of professional services by any person, firm, association, entity or corporation licensed to perform such services under the law of the state of Idaho." In order to establish a claim for legal malpractice the plaintiff must show: "(a) the existence of an attorney-client relationship; (b) the existence of a duty on the part of the lawyer; (c) a breach of duty by the lawyer (i.e., the lawyer's conduct fell below the standard of care); and (d) the lawyer's deficient performance proximately caused damages." *(Greenfield v. Smith, 395 P. 3d 1279 - Idaho: Supreme Court 2017, at 1285, citing Bishop, 152 Idaho at 620, 272 P.3d at 1251 (citation omitted)).*

70.    Defendants had an attorney-client relationship with the Plaintiff. They had a duty of care outlined in the Idaho Rules of Professional Conduct, the American Bar Association standards, and wide and varied precedent legal cases formulating the duties and standards expected of legal counsel.

71.    To show deficient performance or breach – (c) above -  a defendant must overcome the strong presumption that counsel's performance was adequate by demonstrating "that counsel's representation did not meet objective standards of competence." *(Roman v. State, 125 Idaho 644, 648-49, 873 P.2d 898, 902-03 (Ct. App. 1994). See also Vick v. State, 131 Idaho 121, 124, 952 P.2d 1257, 1260 (Ct. App. 1998)).*

COMPLAINT FOR MALPRACTICE

The American Bar Association's standards – such as ABA Standards for Criminal Justice - have long been considered a legal norm for the conduct of legal counsel.  (*Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) at 689)*.  The ABA standards relevant to Defendant's claims include: *(from the American Bar Association, Criminal Justice Standards for the Defense Function)*:

4-1.2(b) – Functions and Duties of Defense Counsel: "…to ensure that constitutional and other legal rights of their clients are protected…".

4-4.1 – Duty to investigate and Engage investigators: (a) "…duty to investigate all cases…"; (b) "…duty to investigate is not terminated by factors such as… a clients alleged admissions to others of facts suggesting guilt…"; (c) "…investigative efforts should commence promptly and should explore appropriate avenues…"; (d) "…should determine whether the client's interests would be served by engaging… other professional witnesses…".

4-4.3 – Relationship with witness: "…counsel or counsel's agents should seek to interview all witnesses…"

4-4.4 – Relationship with expert witness: (b) "…should evaluate all expert advice, opinions, or testimony independently…"; (c) "…before engaging an expert, defense counsel should investigate the expert's credentials, relevant professional experience…"

4-4.6 – Preparation for court proceedings: (a) "…should prepare in advance for court proceedings. Adequate preparation…often includes: reviewing available documents; considering what issues are likely to arise and the client's position regarding those issues; how best to present the issues and what solutions might be offered; relevant legal research and factual investigation;

COMPLAINT FOR MALPRACTICE

and contacting other persons who might be of assistance in addressing the anticipated issues."

The State of Idaho has embodied these "prevailing professional norms" in its rules of Professional conduct (*IRPC, found at https://isb.idaho.gov/wp-content/uploads/irpc.pdf*) adopted by the Idaho Supreme Court effective July 1, 2004.

Section 1.1 details the competence level expected of counsel: "*A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.*" According to IRPC 1.1(1), factors that determine the lawyer's competence include "training and experience in the field in question" as well as the "preparation and study". It concludes "Expertise in a particular field of law may be required in some circumstances."

IRPC indicates a lawyer can "*provide adequate representation in a wholly novel field through necessary study.*" (IRPC 1.1(2)) as well as through "reasonable preparation" (Id. at 1.1(4)). In addition, "competent handling" of a matter included inquiry into and analysis of the factual and legal elements of the problem…" (*IRPC 1.1(5), Thoroughness and Preparation*).

Defendant's counsel were wholly unfamiliar with bipolar and high functioning autism and ADA law. In spite of Defendant's repeated and consistent attempts at educating his counsel, they nonetheless did not seek nor obtain the "necessary study" to competently handle the present case, nor did they "reasonably prepare" in order to overcome such a deficiency in the subject matter of mental health as part of a defense.

IRPC Section 1.1(5) also measures "competent handling" as requiring "inquiry into and analysis of the factual and legal elements of the problem". Without investigating or bringing

**COMPLAINT FOR MALPRACTICE**

forward the dual diagnosis of bipolar and ASD of the client, and how and whether ADA protections or considerations are relevant, Defendant's counsel failed in this measure of competence.

Similar to IRPC 1.1(5), the Sixth Amendment of the U.S. Constitution imposes on counsel a duty to investigate *(Wiggins v. Smith, at 522 US 510 - Supreme Court 2003 at 522) or (Strickland at 691)*. The Defendant's counsel's lack of investigation, including not meeting with witnesses until after trial commenced, is gross and willful malpractice and breach of duty to the Defendant.

In the present circumstance, the Defendant did all he could at his own expense and even detriment to convince his counsel of the importance of mental health to the defense, prepare necessary materials and strategy, perform research of expert witnesses, and perform the trial preparation functions expected of his retained counsel. Counsel in over two years' time did not avail themselves of this information nor sought their own investigation into the facts or relevant law. Instead they maintained the position that the Defendant "needed to figure out how to explain the calls", which he tried to do based on his mental condition and disability.

Defendant's counsel breached many duties, as defined previously, and lists these breaches and the duty required by counsel which they failed or refused: *(in the case of IRPC, subsections are specified for convenience, but the violation of the whole article is the breach)*

Did not recognize or act on Defendant's ADA recognized disability: Though a Federal violation, this also violates: ABA 4-1.2; ABA 4-4.6(a); IRPC 1.1(1) and (2) and 1.3(1); Idaho Code 3-201(1) and (8); Idaho Constitution Article 1 Section 13, U.S. Constitution 14th

Amendment.

Refused to become educated or research mental health: Violates IRPC 1.1 and 1.3; Idaho

Constitution Article 1 Section 13.

Failed to refer the case for lack of specialty: Violates IRPC 1.1(1) and (2).

Refused to research need for expert witnesses: Violates IRPC 1.1(1), (2), (5) and 1.3(1);

ABA 4-4.1(d).

Failed to research/provide info for Dr. Davidson: Violates IRPC 1.1(5), 1.3(1); ABA 4-

4.4(b), (c), (g).

Refused to disclose mental health report in discovery/bring forth evidence: Violates ABA 4-

4.6(a); IRPC 1.1(5); Idaho Code 3-201(1) and (8); Idaho Constitution Article 1 Section 13, U.S.

Constitution 14th Amendment. While there may be no specific duty to present evidence, failure

to present potential mitigating evidence can contribute to a finding that counsel professionally

failed their client. *(Williams v. Taylor, 529 US 362 - Supreme Court 2000 at 396)*.

Failed to properly review expert report (missing a crucial detail): Violates ABA 4-4.3(b) and

4-4.6(a); IRPC 1.1(5).

Refused to disclose mental health report in discovery/bring forth: Violates ABA 4-4.6(a);

IRPC 1.1(5); Idaho Code 3-201(1) and (8); Idaho Constitution Article 1 Section 13, U.S.

Constitution 14th Amendment.

Refused to investigate State's case: Violates ABA 4-4.1(a),(b),(c),(d), 4-4.6(a); IRPC 1.1(5).

Refused to investigate strategies or courses of action: Violates ABA 4-4.1(c) and 4-4.6; IRPC

1.1(5), 1.3(1). It is also codified in law that defense counsel have a duty to investigate *(Williams*

COMPLAINT FOR MALPRACTICE

*v. Taylor at 529).*

Refused to respond to specific request for reasonable accommodation: Violates ADA/14[th]
Amendment violation; ABA 4-1.2; ABA 4-4.6(a); IRPC 1.1(1) and (2) and 1.3(1); Idaho Code 3-
201(1) and (8); Idaho Constitution Article 1 Section 13.

Refused to research effect of mental health and duress on the calls as explanation: Violates
ABA 4-4.1(c) and (d) and 4-4.6(a); IRPC 1.1(5), 1.3(1).

Failed to prepare for trial: calls, case materials and examination materials: Violates ABA 4-
4.6(a); IRPC 1.1(5) and 1.3(1).

Refused to timely interview/prepare witnesses: Violates ABA 4-4.3(c); IRPC 1.1(5) and
1.3(1).

Procedural mismanagement of witnesses (Mr. Peterson, Mrs. Peterson, M.W.): Violates 4-
4.3(c), 4-4.6(a); IRPC 1.1.

Neglect interfered with Defendant's 5th Amendment or opportunity to testify: Violates ABA
4-1.2(b), IRPC 1.1, Idaho Code 3-201, Idaho Constitution Article 1 Section 13; U.S. Constitution
5th and 14th Amendment.

Refused to mitigate/manage phone call evidence for lack of familiarity: Violates ABA 4-
4.6(a); IRPC 1.1(5).

Refused to present mitigating evidence (conspiracy, inconsistent police reporting,
exonerating testimony) either through neglect or lack of investigation: Violates ABA 4-4.1(d), 4-
4.6(a); IRPC 1.1(5).

Failure in jury instructions: Violates IRPC 1.1(5) and 1.3(1).

**COMPLAINT FOR MALPRACTICE**

Failure to object to State's assumptive intent close: Violates 4-1.2(b), 4-4.6(a); IRPC 1.1(5) and 1.3(1).

Failed to ask for directed verdict on the record or motion for acquittal at conclusion: Violates ABA 4-8.1; IRPC 1.3(1).

Plaintiff recognizes that some acts or omissions by themselves may not be sufficient to constitute harmful error, but many do represent harmful errors and malpractice with clear impact on the jury. Additionally, when the cumulative totality of these errors are evaluated it is evident these errors resulted in an illegal and prejudiced verdict and the Plaintiff did not have a fair trial, resulting in a miscarriage of justice.

Counsel's actions in this case rise to the level of professional malpractice. The key factors supporting this argument are as follows:

1. Lack of preparation: Counsel demonstrated a lack of preparation throughout the trial, resulting in missed opportunities to present crucial evidence, cross-examine witnesses effectively, and challenge the prosecution's case.

2. Failure to utilize key evidence: Counsel neglected to present essential evidence, such as the mental health report, which could have significantly strengthened the Defendant's defense. The decision not to use this evidence was without proper basis or research.

3. Inexperience with mental health issues: Counsel's lack of familiarity with mental health as it relates to the defense prevented them from effectively addressing and presenting the Defendant's autism diagnosis and its potential impact on the case.

4.  Inability to handle critical witnesses: Counsel's mishandling of witnesses, including mistakenly releasing key witnesses and the inability to recall them for rebuttal, hindered the Defendant's ability to challenge the prosecution's case and present a complete defense.

5.  Shift of burden of proof: Counsel failed to object to the Prosecutor's improper shifting of the burden of proof to the Defendant during closing arguments. This tactic wrongfully placed the onus on the Defendant to provide evidence of his innocence, undermining the presumption of innocence.

6.  Suppression of evidence: Counsel allowed the State to suppress and limit important evidence, hindering the Defendant's ability to present a comprehensive and fair defense.

7.  Lack of effective trial strategy: Counsel's trial strategy appeared disjointed, and they failed to provide clear guidance to the Defendant, leaving him without a coherent approach to address the charges effectively.

72.  The final prong to substantiate malpractice is "(d) the lawyer's deficient performance proximately caused damages". Plaintiff has suffered and will suffer great damages for the malpractice of his counsel. Having been convicted by a jury, he faces up to two life sentences. His wrongful conviction due to malpractice, regardless of his sentencing, has resulted in the following harms:

-  Loss of Personal Freedom: Incarceration, monitoring, parole, probation, loss of unquestioned interstate travel, and loss of most international travel for life.

COMPLAINT FOR MALPRACTICE

- Stigmatization: Being labeled as a sex offender carries a powerful social stigma that results in ostracization and discrimination from society at large. This stigma affects personal relationships, social interactions, and community acceptance. Plaintiff is barred from family events, interacting with his grandchildren, attending church or social functions with minors present, etc.

- Limited Housing Options: Restrictions on living options if ever released from prison includes being barred from residing near schools, parks, or other areas where children congregate. This will lead to difficulty finding stable and suitable housing.

- Employment Challenges: Plaintiff has forever lost his ability to work in his chosen field he spent his lifetime pursuing education and experience. He will forever be financially ruined due to this trial and incarceration.

- Loss of Civil Rights: Plaintiff has lost many civil rights, such as the right to vote and the right to bear arms.

- Mental Health Impact: Plaintiff is bipolar and autistic. The stress, anxiety, and social isolation associated with sex offender status has a significant impact on Plaintiff's mental health and well-being.

- Strain on Personal Relationships: The stigma and legal consequences have strained Plaintiff's personal relationships, including family bonds, friendships, and romantic partnerships. His children have suffered equally for the societal humiliation and trauma this process has caused.

- Financial Burden: Plaintiff has sold all of his possessions, lost his job, borrowed money,

and maxed out all his lines of credit to be able to afford the $100,000 price tag of his defense.

-   Loss of Reputation: Plaintiff's reputation is irreparably damaged.

-   Community Supervision: If ever released from prison, Plaintiff will be subject to strict community supervision, including probation or parole, which will limit his freedom and require compliance with numerous conditions.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.   Sanctions against Jon Cox in the amount of $620,000.

b.   Sanctions against Edwina Elcox in the amount of $860,000.

c.   Damages against Cox Law in the amount of $6,000,000.

d.   Damages against Jon Cox in the amount of $13,000,000.

e.   Damages against Elcox Ventures in the amount of $4,000,000.

f.   Damages against Edwina Elcox in the amount of $10,000,000.

g.   Compensatory damages weighted by the court of $2,700,000 for lost work and career, legal expenses, loss of assets.

h.   Other appropriate damages or sanctions against appropriate parties to be determined at trial and determined, weighted, and assigned by the Court.

COMPLAINT FOR MALPRACTICE

Dated ____9/22/23_____ __

                                          By:

                                              ___/s/ David A Crossett____

                                          David A. Crossett, *pro se*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on _____9/22/23_____, I caused to be served a true and correct copy of the foregoing document upon the following individual, by the method indicated, and addressed as follows:

Cox Law                                    [  ]    U.S. Mail, postage prepaid
199 N. Capital Blvd., Ste. 601             [  ]    Hand Delivered/Process Server
Boise, ID  83702                           [ X ]   E-filing/Email
                                                   coxlaw@coxlawboise.com


Jon Cox                                    [  ]    U.S. Mail, postage prepaid
199 N. Capital Blvd., Ste. 601             [  ]    Hand Delivered/Process Server
Boise, ID  83702                           [ X ]   E-filing/Email
                                                   jon@coxlawboise.com


Edwina Elcox                               [  ]    U.S. Mail, postage prepaid
c/o Duke Evett                             [  ]    Hand Delivered/Process Server
1087 W. River Street,                      [ X ]   E-filing/Email
Ste. 300 ,                                         ked@dukeevett.com
Boise ID  83702


Elcox Ventures                             [  ]    U.S. Mail, postage prepaid
8777 W. Holdbrook Ave.                     [ X ]   Hand Delivered/Process Server
Boise, ID  83704                           [  ]    E-filing/Email


                                    _____/s/ David A. Crossett_____
                                    Signed:    David A. Crossett